AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO
JUN 21 2019
MITCHELL R. ELFERS
CLERK

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

7440 Central Ave SE, # 15
Albuquerque, New Mexico, 87108

Case No. 19 mr 740

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ District of ___New Mexico___, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to possess with intent to distribute and to distribute controlled substances; |
| b. 21 U.S.C. § 846(a)(1) | Distribution of controlled substances. 21 U.S.C. 841 (possession with intent to distribute and distribution of controlled substances) |

The application is based on these facts:
See Affidavit

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Matthew Hoisington, Task Force Officer
*Printed name and title*

Sworn before me by reasonable electronic means.

Date: __6/20/2019__

_____
Judge's signature

City and state: Albuquerque, New Mexico

Laura Fashing, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Matthew Hoisington, being duly sworn, hereby depose, and state as follows:

I am a sworn Law Enforcement Officer with the Albuquerque Police Department and have been since June 2004. Additionally, I am a federally deputized Task Force Officer with DEA and have served in this capacity since October 2014. I am currently assigned to the DEA Tactical Diversion Squad, Albuquerque District Office.

I graduated from the Albuquerque Police Department training academy where I received approximately 800 hours of specialized law enforcement training, to include narcotics related investigations. The training included controlled substances identification, narcotics related investigative techniques, interview and interrogation training, tactical applications of narcotics enforcement. I have participated in the execution of numerous warrants to search particular places or premises for controlled substances and/or related paraphernalia, and other evidence of violations of federal drug statues. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts, regardless of the drug, is the trafficker's effort import, conceal, manufacture and distribute controlled substances.

As a DEA Task Force Officer, I have received additional training and have participated in investigations targeting pharmacy robberies, money laundering, asset forfeiture, individuals and organizations trafficking cocaine, cocaine base ("crack"), marijuana, methamphetamine, heroin, and other controlled substances, to as defined in Title 21 United States Code, Section 802.

1

This affidavit is offered in support of an application seeking authorization to conduct a search for contraband contained in storage unit locker number I5 located at the Cubesmart storage facility at 7440 Central Ave. SE, Albuquerque, NM (hereinafter referred to as the SUBJECT PROPERTY). It is my belief that the SUBJECT PROPERTY currently contains evidence of violations of Title 21 United States Code, Section 841(a) (1), the manufacture, distribution and possession with intent to distribute a controlled substance and/or proceeds from illegal narcotics. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have also relied on the experience and assistance of APD Detective Kelly Sinclair, and James Montoya during this investigation.

## BACKGROUND OF THE INVESTIGATION

1. From approximately July 2018 to June 18, 2019, the Drug Enforcement Administration (DEA) conducted a narcotics investigation involving individuals residing at the Best Choice Inn, located at 7640 Central Avenue SE, Albuquerque, New Mexico 87108. During the course of the investigation, they discovered numerous females engaged in commercial sex acts who were residing at the hotel. They also determined that in addition to a high volume of drug activity, the hotel was facilitating and profiting from the women's commercial sex work. Upon uncovering this possible sex trafficking activity at the Best Choice Inn, the DEA and Homeland Security Investigations (HSI) commenced a joint investigation into criminal activity occurring at the Best Choice Inn.

### Ownership, management, and employees of the Best Choice Inn

2.	HSI agent Morgan Langer conducted a public record search through the New Mexico Department of State and determined that Kamal BHULA is the registered agent of Omram LLC, as of February 16, 2018. Omram's principal place of business is listed as 7640 Central Avenue SE, Albuquerque, New Mexico, which is the address of the Best Choice Inn. BHULA has been the on-site manager of the Best Choice Inn since approximately March 2018. BHULA has continued operations at the Best Choice Inn until the present.

3.	On or about October 17, 2018, HSI agent Morgan Langer obtained a list of employees from the New Mexico Department of Workforce Solutions for the Best Choice Inn Doing Business as (DBA) Omram LLC. On the list, there appears the names Kamal BHULA, Eddie HILL, Willie HORTON and Jonathan CRAFT.

### DEA Investigation

4.	During the investigation, a DEA undercover agent (herein after referred to as UC) identified Kamal BHULA as the authority figure at the location with Jonathan CRAFT, aka "Wayan"/"YN", as his number two figure or lieutenant. The UC also is familiar with Willie HORTON, and knows him as a trafficker who operates from the motel and was residing at the motel as of October 2018. The UC uncovered the following information:

5.	On August 17, 2018, the UC met with a female who identified herself as "Armani". "Armani" was positively identified by the UC as sex trafficking victim P.M.. P.M. stated that she pays the rent to her room to Kamal BHULA AKA "Rocky" and that she and other sex workers are charged $10 extra by BHULA and other employees for each customer who visits their rooms for the purpose of commercial sex acts.

3

6. On that same day, the UC was introduced to "Rocky" by "Armani" (P.M.). While in the presence of the UC, "Armani" asked "Rocky" what amount of money she owed on her room. "Rocky" consulted several documents which were located in the management office where this meeting took place. After consulting the documents, "Rocky" informed "Armani" that she owed approximately $81 for the room debt. The UC then paid "Rocky" $100 and informed him that he would be returning to the Best Choice Inn and paying future room debts. On August 31, 2018, The UC paid "Rocky" $150 to cover "Armani's" room debt, which was calculated to be $104 by "Rocky". "Rocky" explained to the UC that late charges are assigned to rooms depending upon when tenants paid their rent. The UC confirmed with "Rocky" that "Armani" is charged a fee per visitor to her room. The UC explained to "Rocky" that he did not want "Armani" charged for his visits. "Rocky" recorded the UC's undercover name in "Armani's" room ledger and said "Armani" would not be charged for future visits from the UC. "Rocky" said room rent was due by 11:00am each day. "Rocky" went on to explain that if visitors were in "Armani's" room for an extended time period, then they would be charged. "Rocky" said they can only charge when they see the visitors. During this interaction, "Rocky" was in the management office. The UC observed the documents referenced were kept in the office.

7. On September 12, 2018, the UC was informed by "Armani" that she had been "kicked out" of her room at the Best Choice Inn due to being behind on her rent. The UC spoke with "Rocky" and inquired as to how much money "Armani" owed on her room. "Rocky" again checked some ledgers and told the UC that she owed $102. The UC observed several $10 bills attached to the room ledgers with paper clips, including to "Armani's" room ledger. The UC paid "Rocky" $150 for "Armani's" debt. "Rocky" stated that "Armani" would owe $13.50 for

4

the following day, due by noon. The UC asked "Rocky" if that amount stays the same if "Armani" does not have any "dates" before noon. "Rocky" applied in the affirmative and further explained that "we try to help the girls" and that short visits or visits that are not observed are not charged. However, extended visits, such as one to two hours, would be charged the fee. "Rocky" also confirmed that the charge is $10. The UC observed the ledgers referenced were kept in the management office.

8. On February 6, 2019, the UC rented room 204 at the Best Choice Inn. While speaking with BHULA in the management office of the Best Choice Inn, BHULA told the UC that that room was next door to "Will's" room and that it would be noisy because "Will" receives frequent visitors to his room. (Your Affiant's Note: "Will" has been previously identified as Willie HORTON). The UC observed numerous substandard conditions in room 204, to include large holes in the bathroom door, a sprinkler attached to the wall via duct tape, a missing dresser drawer, broken fixtures on the wall, torn curtains, a plugged peep hole on the door and badly stained carpet. While standing outside room 204, the UC observed vehicles arriving in the hotel parking lot and female tenants of the hotel exiting from rooms to the meet the drivers of the vehicles. In several instances, the female tenants entered the vehicles and departed the property.

9. At one point, the UC observed a female walk into the parking lot of the hotel from Central Avenue. The female walked to the hotel office window at the same time as the UC. The female rang a doorbell and BHULA appeared. The female asked BHULA how much money she owed and then began to count of several $20 bills (the UC could not hear BHULA's responses). The female asked BHULA if she was still locked out of her room and if her belongings were still in the room. BHULA, aka "Rocky" appeared to answer her question, but his specific response was not heard by the UC. The UC observed "Rocky" to be in the management office during this

interaction.

10.     On March 5, 2019, the UC entered the hotel office and observed a stack of room ledgers on the counter. Several of the ledgers had U.S. currency attached to them and there was also a large pile of various denominations of U.S. currency. BHULA told the UC that he was now renting a house in the Northeast Heights section of Albuquerque and worked at the hotel from 6:00am until 2:00pm daily. BHULA said he moved from the hotel in order to keep his family (his wife and small child) away from the violence and the unpleasant people in and around the hotel. BHULA said that if he was not physically at the hotel, then "YN" is in charge. (Your Affiant Note: "YN" has been previously identified as Jonathan CRAFT by the UC and several SOIs). Later that day, BHULA explained that he does not rent rooms 201 to 207 for extended periods because he wanted to keep the "riff-raff" away from the hotel office area.

11.     BHULA then called CRAFT to the office to meet the UC. The UC told BHULA and CRAFT that he expected several visitors and CRAFT pointed to a sign taped to the office window which stated that each visitor to a hotel room would incur a charge. CRAFT then went on to explain that if the UC paid $20 that would satisfy the visitor upcharge for that day. The UC attempted to hand CRAFT a $20 bill but CRAFT pointed to BHULA and said "pay him." The UC then gave the $20 bill to BHULA. Later, after CRAFT had left, BHULA returned the $20 bill to the UC and explained that the UC would not have to pay the visitor upcharge even though other guests of the hotel did have to pay. Later that day, CRAFT explained to the UC that he was always present at the hotel and it was his responsibility to maintain order and monitor activities at the hotel.

12.     On March 6, 2019, the UC observed CRAFT arrive at the hotel in a black Mercedes. CRAFT then went to a room on the second floor of the hotel that the UC could not

identify. CRAFT was in the room for a period of time and then exited. After exiting, CRAFT yelled to the UC that he should call him and that his telephone number is 505-717-9828.

13. On March 8, 2019, the UC asked BHULA if it would be acceptable if a "girl" could use his room when he was not present. BHULA said it was permissible as long as BHULA knew who she was and had her name on the UC's room ledger. The UC said the "girl" would likely have several visitors and she would be "taking care of business". The UC asked BHULA if he could pay her visitor fees and BHULA responded "yes". The UC asked if CRAFT kept track of visitors (for paying fees) and BHULA responded "yes" again. This interaction when BHULA was in or near the management office.

14. On April 2, 2019, your affiant was conducting an undercover operation involving the Best Choice Inn. Agents observed a confidential informant (CI) arrive at the Best Choice Inn with a known resident of the Best Choice Inn, Lyron Woolridge. Agents were observing the individuals to determine whether a drug deal would occur. Woolridge exited the vehicle and walked behind the stairs in the middle of the complex and out of view. Approximately five minutes later, CRAFT approached the CI at the passenger side window and had a conversation with the CI. Approximately a minute later, Woolridge returned to the CI's vehicle, and stopped to talk with CRAFT who had moved to the second floor. The CI and Woolridge left and drove to another hotel. Approximately 20 minutes after that, CRAFT was observed by an APD Detective to be walking out of the CubeSmart Storage located at 7440 Central Ave. SE, Albuquerque, NM. Based on my training and experience, drug dealers often will keep illegal narcotics, drug paraphernalia and packaging materials, firearms, proceeds from illegal drug trafficking, and records relating to their illegal drug trafficking activities in storage lockers in an effort to conceal and store those items. Also, CRAFT was observed using a cell phone many times during the

course of the investigation, and based on my training and experience, drug traffickers often use multiple cell phones to conduct their drug trafficking activities.

15.     On June 18, 2019, a federal search warrant was executed on 7640 Central Ave SE, Albuquerque, New Mexico at the Best Choice Inn. Upon a search of room 112 (which was identified as CRAFT's room) there was suspected heroin in excess of 100g and over 30g of white powder found in CRAFT's room. Agents also located a firearm in room 112.

16.     Records obtained from CubeSmart show CRAFT to rent storage locker I5 as of 3/20/2019. On June 18, 2019 APD Detective Sinclair #3040 deployed canine Pacha on a row of storage lockers (#I 1 though #I 7). Detective Sinclair placed canine Pacha in a down position to the east of locker number I7. Detective Sinclair gave canine Pacha the search command and conducted a free search down the row of lockers, working in a west bound direction. When canine Pacha reached the end of the row of lockers, she turned and conducted a free search back in an east bound direction. As canine Pacha passed by the pillar separating lockers # I4 and # I5, Detective Sinclair observed canine Pacha "alert". The "alert behavior Detective Sinclair observed was that canine Pacha's ears and tail became erect, her rate of respiration increased, her movements slowed down and became methodical. Canine Pacha jumped upwards, sniffing the seam between the pillar and the door to locker #I5, and immediately "indicated." An "alert" is a change of body posture and increased respiration when the dog first encounters the odors it has been trained to detect. An "indication" is a trained behavior that pinpoints source.

17.     Detective Sinclair has been a narcotic detection canine handler since October 12, 2011. Detective Sinclair and Canine Pacha are certified as a narcotics detection team through the California Narcotics Canine Association and through the National Narcotics Detector Dog

Association. Canine Pacha has been trained to detect the odors of methamphetamine, cocaine, heroin, and marijuana.

## FEDERAL CHARGES RELATED TO THIS INVESTIGATION

On June 12, 2019, a federal Grand Jury sitting in Albuquerque, in the District of New Mexico, handed down a ten-count indictment (Criminal No. 19-CR-1631) against the following individuals and corporation:

> KAMAL BHULA, a.k.a "Rocky," JONATHAN CRAFT, a.k.a "Jonathon Craft,"
> a.k.a "YN," a.k.a "Wayan," WILLIE HORTON, and OMRAM, LLC

The persons and corporation charged in the indictment, and the offenses for which they have been charged, include the following:

> Count 1: 18 U.S.C. § 1594(c): Conspiracy
>
> Counts 2-4: 18 U.S.C. §§ 1591(a)(1) and (b)(1): Sex Trafficking by Means of Force, Fraud, and Coercion; 18 U.S.C. § 2: Aiding and Abetting;
>
> Count 5: 18 U.S.C. § §1592(a)(1) and (b)(1): Benefitting Financially from a Sex Trafficking Venture; 18 U.S.C. § 2: Aiding and Abetting;
>
> Count 6: 18 U.S.C. § 1952(a)(3)(A): Interstate and foreign Travel and Transportation in Aid of Racketeering enterprises; 18 U.S.C. Aiding and Abetting;
>
> Count 7: 21 U.S.C. § Conspiracy;
>
> Count 8: 21 U.S.C. § 856(a): Maintaining a Drug-Involved Premises; 18 U.S.C. § 2: Aiding and Abetting;

Count 9: 21 U.S.C. § 860(a): Maintaining a Drug-Involved Premises Within 1,000 Feet of a School; 18 U.S.C. § 2: Aiding and Abetting;

Count 10: 18 U.S.C. § 1956(h): Conspiracy to Commit Money Laundering.

Federal arrest warrants have issued resulting from the indictment.

## V. CONCLUSION

Based upon the information contained herein, your Affiant states that probable cause exists to believe that instrumentalities, fruits, and/or evidence of violations of Title 18, United States Code, Sections 21 U.S.C. 841 is located on the following premises: 7440 Central Avenue SE, Locker I5, Albuquerque, New Mexico 87108.

Based on the above listed facts listed throughout this affidavit, it is my belief that CRAFT has concealed within the SUBJECT PROPERTY controlled substances and/or proceeds of illegal narcotics and other items related to the trafficking of illegal narcotics.

Wherefore, your Affiant respectfully requests that a search warrant be issued authorizing the search for the items outlined in attachment B.

This search warrant and supporting affidavit were approved by Assistant United States Attorney Letitia Simms.

Matthew Hoisington, Task Force Officer
Drug Enforcement Administration

Sworn to before me by reasonable electronic means
June 20, 2019, at Albuquerque, New Mexico

Laura Fashing
United States Magistrate Judge

## ATTACHMENT A

1. The storage facility is located at 7440 Central Ave SE, #I5, Albuquerque, New Mexico, 87108. The storage door is red in color with the storage number securely attached above the door with a red sign of the storage number "I5" in white numbers. And the storage door is secured with a lock.





## Attachment B

All instrumentalities, fruits, and/or evidence of violations of Title 18, United States Code, Sections 21 U.S.C. 841, including:

1. Books, records, receipts, notes, ledgers, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

2. Papers, tickets, notes, schedules, receipts and other items relating to foreign and domestic travel by Johnathan CRAFT hereinafter referred to as "the SUBJECT";

3. In any medium, including electronic medium, books, records, receipts, bank statements and records, financial statements, insurance records, loan applications and records, wills, real estate records, money drafts, letters of credit, money orders and cashier's checks, safe deposit box keys, records and agreements, and other documents evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining and/or secreting currency equivalents by the SUBJECT, and other individuals and business entities acting on their behalf;

4. Cellular telephones;

5. United States currency, precious metals, precious stones, jewelry, and financial instruments, including stocks and bonds;

6. Photographs and videos, in any medium, of the SUBJECT, assets, and/or depicting unlawful controlled substances;

7. Notes, records, diaries, journals and papers referencing any interest the SUBJECT may have in any business entities;

8. Records indicating occupancy, residency, and/or ownership, dominion and/or control, of the PREMISES including utility, cable, and telephone bills, cancelled envelopes, and keys;

9. Firearms and ammunition;

10. Sales receipts for items evidencing the expenditure of currency and/or currency equivalents;

11. Paraphernalia for packaging, weighing and distributing unlawful controlled substances, including scales, plastic bags, plastic wrap, packing tape, bags and/or back packs used in the transporting and carrying of controlled substances.

12. In any medium, including electronic medium, documents, books and papers reflecting names, addresses and/or telephone numbers pertaining to the SUBJECT listed above;

13. In any medium, including electronic medium, books, records, receipts, notes, ledgers, invoices, bank records, diaries, purchase records, cash receipts and disbursements journals, inventory records and other records relating to the sales, repackaging, and redistribution of controlled substances;

14. In any medium, including electronic medium, records, journals, promissory notes, receipts, and other documents reflecting loans and loan repayment by and between any Financial Institution and the SUBJECT and entities listed above;  all of which are fruits, evidence and instruments of crimes against the United States Government;

15. Any unlawful controlled substances or suspected controlled substances, including methamphetamine and heroin;

16. In any medium, including electronic medium, receipts, records, and documents depicting subscriber data and itemized telephone calls to other potential drug traffickers from the residential telephone and cellular telephones utilized or associated to the SUBJECT;

17. In any medium, including electronic medium, receipts, records, and documents indicating ownership, association, and utilization of vehicles by the SUBJECT and others, to include maintenance and alterations to the vehicles;